JULIAN HAMMOND (SBN 268489)
jhammond@hammondlawpc.com
ADRIAN BARNES (SBN 253131)
abarnes@hammondlawpc.com
POLINA BRANDLER (SBN 269086)
pblandler@hammondlawpc.com
ARI CHERNIAK (SBN 290071)
acherniak@hammondlawpc.com
HAMMONDLAW, P.C.
1201 Pacific Ave, 6th Floor
Tacoma, WA 98402
(310) 601-6766 (Office)
(310) 295-2385 (Fax)

*Attorneys for Plaintiff and the Putative Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **LARION KRAYZMAN,** on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**ISTOCKPHOTO, LP.**<br>Defendant. | Case No. _____<br><br>CLASS ACTION COMPLAINT<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Larion Krayzman, on behalf of himself and all others similarly situated, alleges the following based upon personal knowledge, or, where applicable, information, belief, and the investigation of counsel:

## NATURE OF THE ACTION

1.       This case is about Defendant iStockphoto, LP's ("iStock" or "Defendant") unlawful disclosure of Plaintiff's and Class Members' private information about their personal video-viewing habits and activities.

2.       iStock develops, owns and operates the subscription service, iStock, which features over one million prerecorded videos.[1] As Getty Images, Inc. states in its most recent Form 10-K, "iStockphoto markets its library of prerecorded videos to content creators. As iStock is our value offering of creative stills and videos, which provides a significant volume of exclusive image and video content to small to medium sized businesses, furnishing them with a powerful and cost-efficient means to produce and maintain their visual narrative."[2]

3.       iStock makes money by both offering paid subscriptions to this video library as well as by offering individual videos for sale.[3]

4.       Plaintiff and other Class Members must either subscribe to iStock or purchase credits to license and download prerecorded videos at www.istockphoto.com. A video subscription costs $99 per month, which is visible in Figure #1 below:[4]

//

//

//

//

//

//

---

[1] *See* https://www.istockphoto.com/videos-free (Last visited May 17, 2024).
[2] *See* Getty Images Holding, Inc.'s SEC 10-K for Fiscal Year ending in December 31, 2023, p. 6. https://investors.gettyimages.com/node/12706/html.
[3] *Id.*
[4] *See* https://www.istockphoto.com/plans-and-pricing (Last visited May 17, 2024).

1

## **FIGURE #1**



5.        Federal law recognizes, through the Video Privacy Protection Act ("VPPA"), that our video-viewing habits are intimately private. The law accordingly requires companies that sell, rent, or offer subscriptions to prerecorded videos to maintain their customers' privacy and forbids, among other things, the knowing disclosure of customers' video choices to any third party without the customers' specific advance written consent.

6.        Despite its clear legal obligations under the VPPA, Defendant knowingly discloses its subscribers' personally identifiable information—including a record of every video clip they view or download—to a third party, Meta Platforms Inc. ("Meta") (formerly known as Facebook) ("Meta" or "Facebook"), without Plaintiff's or other Class Members' consent.

7.        Plaintiff brings this class action on behalf of himself and all others similarly situated to recover actual and statutory damages against iStock for its unlawful conduct

//

//

//

1

**PARTIES**

2      8.      Plaintiff Larion Krayzman is, and has been at all relevant times, a resident of

3  Encino, California. In or about April 2024, Krayzman signed up for the "Premium+Video" service

4  that iStock states provides access to "[a]ll images, videos and music tracks", and allows "access

5  [to] our entire creative library[,]"[5] by agreeing to pay a monthly subscription rate. Since he first

6  subscribed to iStock's services, Krayzman has viewed and downloaded, and continues to view and

7  download, prerecorded videos on iStock's website— https://www.istockphoto.com. Throughout

8  the time that Krayzman has subscribed to Defendant's services, he has owned a Facebook account

9  and has used this account during the same period.

10      9.      Defendant iStockphoto, LP is an Alberta based Canadian Limited

11  Partnership.

12

**JURISDICTION**

13      10.      This Court has jurisdiction over the subject matter of this action pursuant to

14  28 U.S.C. § 1331, because this suit is brought under the laws of the United States, *i.e.*, the Video

15  Privacy Protection Act, 18 U.S.C. §§ 2710 *et seq.*

16      11.      This Court has specific jurisdiction over Defendant because Defendant has

17  purposefully and differentially directed and targeted the U.S. market, by and through the following

18  actions described in subparagraphs (a)-(m):

19      (a)      Out of iStock's six server facilities, four are located in the United

20  States, which on information and belief, provides iStock's U.S. customers with reduced latency

21  and improved website performance as compared to iStock's non-U.S. based customers.[6]

22      (b)      The majority of iStock's Point of Presence ("POP") servers are

23  located in the U.S., which on information and belief, provides iStock's U.S. customers with

24  reduced latency and improved website performance as compared to iStock's non-U.S. based

25  customers.[7]

26  _____

27  [5] *See* https://www.istockphoto.com/plans-and-pricing. (Last Accessed on May 17, 2024).
[6] iStock's servers are actively managed by Amazon Web Services, U.S. based service.

28  [7] iStock's CDN Network utilize Amazon Web Services Cloud Front.

(c)     Data from May 2024 shows that the vast majority of iStock's market comes from the United States; specifically, nearly 18% of iStock's traffic comes from the United States, followed by Brazil with 5% of the traffic.[8]

(d)     iStock also regularly transacts business with its United States' customers through its use of Stripe, a payment processing service provider located at 354 Oyster Point Boulevard, South San Francisco, California, 94080. Stripe processes iStock's U.S. based transactions and payments for iStock's photo credits and subscriptions.

(e)     HubSpot, another United States corporation located in Cambridge, MA, hosts all of iStock's email servers, specifically storing and tracking emails to recipients.

(f)     iStock directs its consumers to file their privacy complaints and concerns at 605 5th Avenue South, Suite 400, Seattle, WA 98104.[9]

(g)     iStock also solicits content from U.S. based creators.[10]

(h)     iStock's content providers are directed to sign a non-exclusive agreement (the "Content Agreement") with iStock's affiliate corporation, Getty Images (US), Inc. (a Seattle, Washington based corporation).[11]   After the signing the Content Agreement, iStock's website directs its content provides that, "you can then upload your files to iStock—accepted files will be available for licensing by all customers on istock.com, subscription customers on gettyimages.com, and via many other distribution partners…"[12]

(i)     Clicking the "about us" link on istockphoto.com, takes the viewer to gettyimages.com, a website of a U.S. Corporation.[13]

(j)     iStock has previously consented to U.S. Jurisdiction.[14]

//

//

---

[8] See May 2024 Similiarweb  iStockphoto.com's website analysis.
[9] *See* https://www.istockphoto.com/legal/privacy-policy. (Last visited May 17,2024).
[10] *See* https://www.istockphoto.com/workwithus. (Last visited May 17, 2024).
[11] *See* https://www.istockphoto.com/workwithus. (Last visited May 17, 2024)
[12] Id.
[13] See https://www.gettyimages.com/about-us (Last visited May 17, 2024).
[14] *See Sandler v. iStockphoto, LP*, No. 2:15–cv–03659–SVW–JEM, Dkt. 20 (C.D. Cal., 05/14/2015, *see also Uniloc USA, Inc., et al. v. iStockphoto LP*, No. 6:13-cv-00944-LED, Dkt. 13 (E.D. Tex.,12/10/2013)

(k)     iStock's unlawful disclosure of Plaintiff's "personably identifiable information", in violation of 18 U.S.C. § 2710(b), occurred in California, causing the inflection of actionable harm and injury to Plaintiff in California, where Plaintiff resides.

(l)     iStock has engaged in significant, long-term business activity purposefully directed toward the United States, including California, by, *inter alia*, the maintenance of its interactive websites directed at and accessible to residents of California and the United States. In particular, Plaintiff accessed Defendant's website, istockphoto.com, from California.

(m)     Defendant's activities in the Unites States and California are continuous and systematic, and Defendant directs substantial business activity into this forum.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving raise to the claims asserted in this action occurred in the judicial district where this action is brought.

## **THE VPPA**

13.     The origins of the VPPA began with President Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a video rental store disclosed the nominee's rental history.  Congress responded by passing the VPPA, with an eye on the digital future. As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home.  In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone.  I think this is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

14.     The United States Congress passed the VPPA in 1988, seeking to confer onto consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape providers." S. Rep. No. 100-599, at 8. "The Act

reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.*

15.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information ("PII") as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

## **FACTUAL BACKGROUND**

### I.     ISTOCK HAS PROVIDED VIDEO TAPE SERVICES THROUGHOUT THE CLASS PERIOD

16.     iStock operates a stock video subscription service by which its user can watch, license, and download prerecorded videos.[15]

17.     Plaintiff and other Class Members must either buy credits or subscribe to iStock in order to license and download prerecorded videos on www.istockphoto.com. A video subscription costs $99 per month.

18.     Once subscribed to iStock, Plaintiff and other Class Members may select from among millions of pre-recorded videos to watch and download.

19.     Thus, Defendant is a "video tape service provider" within the meaning of 18 U.S.C. § 2710(a)(4) because it is engaged in the business of "rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."

20.     And, Plaintiff and other Class Members are "consumers" within the meaning of 18 U.S.C. § 2710(a)(1) because they are "subscriber[s] of goods or services from a video tape service provider."

---

[15] *See* https://www.istockphoto.com/footage. (Last visited on May 17, 2024).

## II.   ISTOCK UNLAWFULLY DISCLOSED AND/OR RELEASED PLAINTIFF'S AND CLASS MEMBERS' PERSONALLY IDENTIFIABLE INFORMATION TO META.

21.     Throughout the Class Period, beginning on an unknown date and continuing to the present, Defendant has released or disclosed Plaintiff's and other Class Members' Personally Identifiable Information to Meta using Meta's tracking pixels.

22.     Personally Identifiable Information ("PII") is defined as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

23.     As the Federal Trade Commission has stated, companies who use pixels, like the ones used by Defendant in this case, have numerous options to monetize their use of these pixels.

24.     According to the FTC: "Pixel tracking can be monetized in several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns. The data can be used to target more specific audiences with ads and other marketing messages. Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings."[16]

### A. The Meta Tracking Pixel

25.     Meta, which operates Facebook and was called Facebook, Inc. until changing its name in January 2022, is the world's largest social media company. Meta reported having 2.04 billion daily active users as of March 2023,[17] and reported $116.61 billion in revenue in fiscal year 2022.[18]

_____

[16] *See* https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (citing M. Eddy. "How Companies Turn Your Data Into Money." PC Mag. October 10, 2018. https://www.pcmag.com/news/how-companies-turn-your-data-into-money) (last visited June 13, 2023.)

[17] Meta Reports First Quarter 2023 Results, https://s21.q4cdn.com/399680738/files/doc_news/Meta-Reports-First-Quarter-2023-Results-2023.pdf

[18] Meta Reports Fourth Quarter and Full Year 2022 Results, 2/1/23, https://s21.q4cdn.com/399680738/files/doc_financials/2022/q4/Meta-12.31.2022-Exhibit-99.1-FINAL.pdf (last visited 6/6/2023).

26.        Meta's current revenue, as well as its revenue when the company was called Facebook, Inc., has been derived almost entirely from selling targeted advertising to Facebook users, users of its family of apps including Instagram, and internet users on non-Facebook sites that integrate Meta marketing source code on their websites. Meta reported in Fiscal Year 2022 that its revenue from advertising was over $113 billion and Meta stated that it "generated substantially all of our revenue from selling advertising placements on our family of apps to marketers."[19] In its 10k filing covering the fiscal year 2018, Facebook similarly admitted that, "We generate substantially all of our revenue from selling advertising placements to marketers."[20]

27.        Facebook describes itself as a "real identity platform,"[21] meaning users are allowed only one account and must share "the name they go by in everyday life."[22]   Therefore, when users create an account, they must provide their first and last name, along with their birthday and gender. [23]

28.        Facebook sells advertising space by highlighting its ability to target users.[24] Facebook can target users so effectively because it surveils user activity both on and off its site.[25] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "Connections".[26] Facebook complies this information into a generalized dataset called "Core Audiences", which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[27]

---

[19] Meta, SEC 10k filing for the Fiscal Year Ending Dec. 31, 2022, https://www.sec.gov/Archives/edgar/data/1326801/000132680123000013/meta-20221231.htm (last visited June 19, 2022).
[20] Facebook, SEC 10k filing for the Fiscal Year Ending Dec. 31, 2018. https://www.sec.gov/Archives/edgar/data/1326801/000132680119000009/fb-12312018x10k.htm.
[21] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).
[22] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.
[23] FACEBOOK, SIGN-UP, http://www.facebook.com/
[24] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.
[25] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[26] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.
[27] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK,https://www.facebook.com/business/news/Core-Audiences.

29.       Advertisers can also build "Custom Audiences."[28] Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have visited [their] website."[29] Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[30] Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Facebook. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[31] One such Business Tool is the Meta Tracking Pixel.

30.       The Meta Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website.  Once activated, the Meta Tracking Pixel "tracks the people and type of actions they take."[32] When the Meta Pixel captures an action, it sends a record to Facebook. Once this record is received, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

31.       Advertisers control what actions—or, as Facebook calls it, "events"—the Meta Tracking Pixel will collect along with what pages a visitor views and what buttons a visitor clicks.[33]  Advertisers can also configure the Meta Tracking Pixel to track other events.  Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor

//

//

---

[28] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494
[29] FACEBOOK, ABOUT EVENTS CUSTOM AUDIENCE, https://www.facebook.com/business/help/366151833804507?id=300360584271273.
[30] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.
[31] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494.
[32] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.
[33] See FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; see also FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142.

32.    // views or purchases.[34]  An advertiser can also create their own tracking parameters by building a "custom event."[35]

33.    Advertisers control how the Meta Tracking Pixel identifies visitors. The Meta Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[36] Http Headers collect "IP Addresses, information about web browser, page location, document, [referrer] and persons using the website."[37] Pixel-specific Data includes "the Pixel ID and cookie."[38]

34.    FTC Commissioner Rohit Chopra addressed the harms that can be caused by sharing information with Facebook when he stated in 2019, "Because behavioral advertising allows advertisers to use mass surveillance as a means to their undisclosed and potentially nefarious ends, Facebook users are exposed to propaganda, manipulation, discrimination, and other harms.  . . . Facebook's massive, private, and generally unsupervised network of advertisers has virtually free rein to microtarget its ads based on every aspect of a user's profile and activity. The company's detailed dossiers of private information includes things like a user's location and personal connections, but it also includes the history of everything a user has ever done wherever Facebook is embedded in the digital world."[39]

### B.    iStock Knowingly Sends Plaintiff's and Other Class Members' Personally Identifiable Information (PII) to Meta

35.    Starting on a date unknown and continuing to the present, Defendant embedded the Meta Pixel on and throughout its website—www.istockphoto.com—and transmitted //

---

[34] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.
[35] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142.
[36] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/.
[37] See id.
[38] See id.
[39] See Dissenting Statement of FTC Commissioner Rohit Chopra, In re Facebook, Inc., Commission File No, 1823109, July 24, 2019.
https://www.ftc.gov/system/files/documents/public_statements/1536911/chopra_dissenting_statement on facebook_7-24-19.pdf.

36.     Plaintiff's and Class Members' PII, including their personal identifiers, without their consent, to meta in accordance with the Meta Pixel's configuration.

37.     When Plaintiff or another Class Member visited www.istockphoto.com, the Meta Pixel automatically caused the Plaintiff's or the Class Members' personal identifiers, including IP addresses and the c_user, _fr, _and datr cookies, to be transmitted to Meta, attached to the fact that the Plaintiff or the Class Member had visited the website and the titles of the webpages the Plaintiff or the Class Member visited.

38.     The cookies that were transmitted as a result of the Meta Pixels that Defendant installed on its website conveyed Plaintiff's and Class Members' Facebook IDs (through the c_user cookie), which can be used by Facebook and any ordinary person to find the user's real name, the specific and unique web browser from which the customer is sending the communication, and an encrypted combination of the information contained in those two cookies (fr cookie).

39.     iStock's hosted Meta Tracking Pixel transmits information associated with two distinct events to Facebook, which is visible in Figure #2 below:[40]

**Figure #2**



//

---

[40] This data derives from a tool created and offered by Facebook.

40.   The information associated with these two events—PageView and ViewContent— and transmitted to Facebook permits an ordinary person to identify a specific individual's video viewing behavior.

41.   When a subscriber visits a page that hosts a prerecorded video, the PageView Event transmits the Uniform Resource Locator ("URL") accessed, which contains the title of the video, which is visible in Figure #3 below:

**Figure #3**



42.   The PageView event also sends the title of the prerecorded video in plain text, identifiable by an ordinary person, to Meta.

//

//

43.     When a subscriber views a prerecorded video, the ViewContent Event transmits the Uniform Resource Locator ("URL") accessed, which contains the title of the video, which is visible in Figure #4 Below:

**Figure #4**



44.     The ViewContent event also sends the title of the prerecorded video in plain text, identifiable by an ordinary person, to Meta.

//

//

45.     When a customer downloads a prerecorded video, the Download event transmits the Uniform Resource Locator ("URL") accessed, which contains the title of the video, which is visible if Figure #5 Below:

**Figure #5**



**Meta Pixel Helper**
Learn More

▼ ✓ Download

**CUSTOM PARAMETERS SENT**

**asset_type**: Video
**content_category**: paid
**content_name**: Show

**DATA PROCESSING PARAMETERS SENT**

**dpo**: LDU
**dpoco**: 0
**dpost**: 0

Since Data Processing Options are sent, custom conversions or catalog feedback may not work. Learn more

**EVENT INFO**

**Setup Method**: Manual
**URL called**: Hide

```
https://www.facebook.com/tr/?id=1598725237052889&ev=Downlo
ad&dl=https%3A%2F%2Fwww.istockphoto.com%2Fvideo%2Fa-handgu
n-or-pistol-lying-on-grunge-basement-floor-gm666381396-122
495599%3Fclarity%3Dfalse&rl=https%3A%2F%2Fwww.istockphoto.
com%2Faccount%2Fdownload%2Findividual%2Fcredits%3F&if=fals
e&ts=1715875542450&cd[content_category]=paid&cd[content_na
me]=istock%7Cproduct%7Cvideofcp&cd[asset_type]=Video&sw=19
20&sh=1080&v=2.9.156&r=stable&a=tmSimo-GTM-WebTemplate&ec=
2&o=4125&fbp=fb.1.1715875482675.1334667203&ler=empty&cdl=A
PI_unavailable&it=1715875539587&coo=false&dpo=LDU&dpoco=0&
dpost=0&tm=2&rqm=GET
```

**Load Time**: 29.14 ms
**Pixel Location**: Hide

```
https://www.istockphoto.com/video/a-handgun-or-pistol-lyin
g-on-grunge-basement-floor-gm666381396-122495599?clarity=f
alse
```

//

46.    A visitor who has not logged out of Facebook while watching and/or downloading a video on iStock will transmit the c_user cookie to Facebook. The c_user cookie contains that visitor's unencrypted Facebook ID. When accessing the above video, for example, the Meta Pixel on iStock's website compels the visitor's browser to send multiple cookies, in addition to the c_user cookie, which are visible in Figure #6 below:

**Figure #6**



47.    A Facebook ID, along with the title of the prerecorded video watched and downloaded, is PII.  Anyone can identify a Facebook profile-and all personal information publicly listed on that profile, including a person's first and last name—by appending the Facebook ID to the end of Facebook.com. For example, Meta CEO Mark Zuckerberg's Facebook ID is four and the URL "www.facebook.com/4" will take you to Mark Zuckerberg's Facebook page.

48.    By compelling a visitor's browser to disclose the c_user cookie alongside event data for videos, iStock knowingly discloses information sufficient for an ordinary person to identify a specific individual's video viewing and downloading behavior.

49.    When a visitor's browser has recently logged out of Facebook, iStock compels the browser to send a smaller set of cookies, which are visible in Figure #7 below:

**Figure #7**

| Name | Value |
|------|-------|
| datr | saFWZXu696kRJfnBDt3cUDkn |
| fr | 1Ogh9NXJLEbzBiERt.AWVLGCmLQE4mSzkb6QB_CRCx3jE.BmQmg1..A... |

//

//

//

//

//

50.     The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[41] The datr cookies also identifies a browser.[42]  Facebook, at a minimum, uses the fr cookies to identify users.[43]

51.     Without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser. Facebook uses the cookie for targeted advertising.

52.     Facebook, at a minimum, uses the fr and c_user cookies to link to Facebook IDs and corresponding Facebook profile.

**III.     Experience of Plaintiff Larion Krayzman**

53.     In or about 2004, Plaintiff Krayzman created a Facebook account.

54.     In or about April 2024, Plaintiff Krayzman purchased a digital subscription to iStock in order to watch and download videos.

55.     Plaintiff Krayzman frequently visits iStock to, among other things, watch and download prerecorded videos.

56.     Plaintiff Krayzman's default browser is Google Chrome, and he uses Google Chrome to access istockphoto.com

57.     When Plaintiff Krayzman watches and downloads videos on istockphoto.com, on information and belief, Defendant discloses to Facebook his Facebook ID, browser identifiers, and other identifying information.

58.     When Plaintiff Krayzman watches and downloads videos on iStock, on information and belief, Defendant discloses his event data, which includes the pages he views and the buttons he clicked. This event data, which iStock transmits through first-party cookies, contains the titles of prerecorded videos that Mr. Krayzman watches or downloads.

//

---

[41] Data Protection Commissioner, Facebook Ireland Ltd, Report Of Re-Audit (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.
[42] Facebook, Cookies & Other Storage Technologies, https://www.facebook.com/policy/cookies/.
[43] Id.

59.     Plaintiff Krayzman discovered that iStock surreptitiously collected and transmitted his personally identifiable information in or about April 2024.

### TOLLING OF THE STATUES OF LIMITATIONS

60.     Each unauthorized transmission of Plaintiff's and Class Members' Personally Identifiable Information by Defendant is a separate unlawful act that triggers anew the relevant state of limitations.

61.     Additionally, any applicable statutes of limitation have been tolled by: (1) the fraudulent concealment doctrine based on Defendant's knowing and active concealment and denial of the facts alleged herein including but not limited to its incorporation of the tracking pixels and devices; and (2) the delayed discovery doctrine, as Plaintiff and Class Members did not and could not reasonably have discovered Defendant's conduct alleged herein until shortly before the filing of this Complaint. Plaintiff and Class Members did not discover and could not reasonably have discovered that Defendant was disclosing and releasing their Personally Identifiable Information in the ways set forth in this Complaint until shortly before this lawsuit was filed in consultation with counsel.

62.     The Meta Pixel, and other tracking tools on iStock's website, were and remain entirely invisible to a website visitor.

63.     Through no fault of their own or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendant's unlawful conduct. Defendant's Privacy Policy does not inform Defendant's customers that their Personally Identifiable Information ("PII") will be disclosed to unauthorized third parties such as Meta as described in this Complaint.

64.     Plaintiff was therefore ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

65.     Defendant has exclusive knowledge that iStock's website incorporates the Meta Pixel, and other tracking tools, and the information those pixels and tools are configured to collect and disclose, and yet Defendant failed and continues to fail to disclose to website visitors,

//

66.     including Plaintiff and Class Members, that by interacting with iStock's website their PII would be disclosed to, released to, or intercepted by Meta and other unauthorized third parties.

67.     Under the VPPA, Defendant was and continues to be under a duty to disclose the nature, significance, and consequences of its collection and treatment of website visitors' and customers' PII. However, to date, Defendant has not conceded, acknowledged, or otherwise indicated to iStock's customers and other website visitors that iStock discloses or releases their PII to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

68.     Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

## CLASS ACTION ALLEGATIONS

69.     Plaintiff brings this action, on behalf of himself and all others similarly situated, as a class action pursuant to Federal Rules of Civil Procedure, Rule 23 ("Rule 23").

70.     Pursuant to Rule 23, Plaintiff seeks to represent the following Class (members of which are collectively referred to herein as "Class Members"):

> (a)     All persons in the United States who either subscribed to iStock or purchased credits, and while having a Facebook account, viewed or downloaded prerecorded video content on www.istockphoto.com during the time the Meta Pixel was active on www.istockphoto.com.

71.     Excluded from the Class are Defendant, its employees, agents and assigns, and any members of the judiciary to whom this case is assigned, their respective court staff, the members of their immediate families, and Plaintiff's counsel.

72.     Plaintiff reserves the right to revise or amend the above Class definition based on the discovery of new information.

//

//

//

73.     This action has been brought and may be properly maintained as a class action under Rule 23 because there is a well-defined community of interest in the litigation, the proposed Class is easily ascertainable, and Plaintiff is a proper representative of the Class.

74.     **Numerosity (Rule 23(a)(1)):** The potential members of the proposed Class, as defined and identified herein, are, on information and belief, more than one hundred thousand, and so numerous that joinder of all members of the Class is impracticable.

75.     **Typicality (Rule 23(a)(3)):** Plaintiff Krayzman's claims are typical of the claims of the Class. Plaintiff has been a subscriber to iStock since 2024, he used iStocks's website to view and/or download pre-recorded videos and, as a result, his PII was disclosed to Meta.

76.     **Commonality (Rule 23(a)(2)):** Common questions of fact and law exist as to all Class Members and predominate over the questions affecting only individual members of the Class. With respect to the Class Members these common questions include but are not limited to:

(a) Whether Defendant is engaged in the business of "rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials" and, thus, is a "video tape service provider" within the meaning of 18 U.S.C. § 2710(a)(4);

(b) Whether Class Members are "subscriber[s] of goods or services from a video tape service provider" and, thus, are "consumers" within the meaning of 18 U.S.C. § 2710(a)(1);

(c) Whether Defendant had Meta Pixels embedded on its website that disclosed Class Members' PII to Meta and/or any other unauthorized third party;

(d) Whether Class Members' information collected, disclosed, and shared by Defendant with unauthorized third parties, including Meta, constitutes PII within the meaning of the Video Privacy Protection Act, 18 U.S.C. §§ 2710 *et seq.*;

(e) Whether Defendant obtained "informed, written consent" from Class Members within the meaning of 18 U.S.C. § 2710(b)(2)(b) and meets the requirements of that subsection; and

(f) Whether iStock's acts and practices violated the Video Privacy Protection Act, 18 U.S.C. §§ 2710 *et seq.*

//

77.   **Adequacy of Representation (Rule 23(a)(4))**: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests do not conflict with those of Class Members, he has no conflict of interest with other Class Members, is not subject to any unique defenses, and has retained competent and experienced counsel that has experience in complex consumer protection class action and cases, as well as sufficient financial and legal resources to prosecute this case on behalf of the Class. Plaintiff and his counsel have no interest that is in conflict with or otherwise antagonistic to the interests of other Class Members. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class. Plaintiff and counsel anticipate no difficulty in managing the litigation of this as a class action.

78.   **Predominance and Superiority (Rule 23(b)(3))**: In addition to satisfying the prerequisites of Rule 23(a), Plaintiff satisfies the requirements for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual members of the Class, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy. Here, common issues predominate because liability can be determined on a class-wide basis even if some individualized damages determination may be required. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense presented by complex legal and factual issues of the case to all parties and the court system. Furthermore, the expense and burden of individual litigation make it impossible for Class Members to individually redress the wrongs done to them and individual Class Members do not have a significant interest in controlling the prosecution of separate actions. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court. If this action is not certified as a class action, it will be impossible as a practical matter for many or most Class Members to bring individual actions to recover money from Defendant, due to the relatively small amounts of such individual recoveries relative to the costs and burdens of litigation. Plaintiff anticipates no difficulty in the management of this action which would preclude its maintenance as a class action.

//

79.     Plaintiff reserves the right to add representatives for the Class, provided Defendant is afforded an opportunity to conduct discovery as to those representatives.

## CAUSE OF ACTION

### *VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT, 18 U.S.C. § 2710, ET SEQ.*

### *[ON BEHALF OF PLAINTIFF AND THE CLASS MEMBERS]*

80.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

81.     The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any "consumer" to a third party without the "informed, written consent . . . of the consumer" and the opportunity to opt out of disclosures. *See generally* 18 U.S.C. § 2710.

82.     iStock is a "video tape service provider" because it is "engaged in the business, in or affecting interstate commerce, of . . . delivery of prerecorded . . . audiovisual materials." 18 U.S.C. § 2710(a)(4).

83.     Plaintiff and Class Members are "consumers" because they are "subscribers" to iStock's services, each having agreed to pay a monthly amount to access iStock's library of pre-recorded videos, a service iStock describes as a "subscription." 18 U.S.C. § 2710(a)(1).

84.     iStock discloses "personally identifiable information" of Plaintiff and other Class Members to Meta, and, on information and belief, other unauthorized third parties, because iStock sends "information which identifies a person as having requested or obtained specific video materials" from iStock, 18 U.S.C. § 2710(a)(3), specifically the title and/or identity of every video watched and/or downloaded alongside information that would permit an ordinary person to identify the user.

//

85.     iStock does not seek, let alone receive, "informed, written consent" from Plaintiff and other Class Members, 18 U.S.C. § 2710(b)(2)(B), and it consequently never provides them the opportunity to withdraw any such consent, 18 U.S.C. § 2710(b)(2)(iii).

//

86.     iStock provides Plaintiff's and Class Members PII to Meta, and, on information and belief, other unauthorized third parties, knowingly. In particular, iStock installed, embedded, and/or otherwise permitted the presence of the Meta Pixel, on its website and knew that this pixel and tracking tool would gather and disclose the titles and/or identities of prerecorded videos watched and/or downloaded by Plaintiff and Class Members.

87.     By knowingly disclosing Plaintiff's and other Class Members' personal viewing habits, iStock violates Plaintiff's and other Class Members' statutorily protected right to privacy in their video-viewing habits and activities. *See* 18 U.S.C. § 2710(c).

88.     As a result of the above-described violations, iStock is liable to Plaintiff and each Class Member for actual damages in an amount to be determined at trial or, alternatively, for "liquidated damages in an amount of $2,500." 18 U.S.C. § 2710(c)(2)(A). Under the Act, iStock is also liable for reasonable attorneys' fees, other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury and sufficient to prevent and deter the same or similar conduct by iStock in the future.

89.     Plaintiff, on behalf of himself and the Class, seeks relief as further described below.

### **Prayer for Relief**

**WHEREFORE,** Plaintiff and the Class pray for relief and judgement as follows:

90.     Plaintiff, on behalf of himself and the Class, seeks relief as further described below.

91.     An order appointing Plaintiff Larion Krayzman as Class Representative;

92.     An order appointing the undersigned attorneys as Class Counsel;

//

//

93.     An order awarding Plaintiff and Class Members actual damages but not less than liquidated damages in an amount of $2,500 per Class Member per violation of the Video Privacy Protection Act, 18 U.S.C. § 2710, et seq;

//

94.    An injunction forbidding Defendant from disclosing information about users' video viewing choices to third parties pursuant to 18 U.S.C. § 2710(c)(2)(D);

95.    An award of reasonable attorneys' fees and costs of suit, including costs of investigation;

96.    An award of pre- and post-judgment interest as provided by law; and

97.    An award of such other and further relief, at law and in equity, as the nature of this case may require or as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and all other members of the Class, hereby demands a jury trial on all issues so triable.


Respectfully submitted,

Dated: May 22, 2024                          s/ Julian Hammond
                                        _____
                                        JULIAN HAMMOND (SBN 268489)
                                        jhammond@hammondlawpc.com
                                        ADRIAN BARNES (SBN 253131)
                                        abarnes@hammondlawpc.com
                                        POLINA BRANDLER (SBN 269086)
                                        pbrandler@hammondlawpc.com
                                        ARI CHERNIAK (SBN 290071)
                                        acherniak@hammondlawpc.com
                                        HAMMONDLAW, P.C.
                                        1201 Pacific Ave, 6th Floor
                                        Tacoma, WA 98402
                                        (310) 807-1666

                                        *Attorneys for Plaintiff and the Putative Class*